Betty Lee FLOYD, Appellant,

v.

Henry Homer ORGAN, Jr., Appellee.

No. 10985.

Court of Civil Appeals of Texas.

Austin.

July 11, 1962.

Rehearing Denied Aug. 2, 1962.

Byrd, Davis & Eisenberg, Austin, for appellant.

Gay & Meyers, Austin, for appellee.

HUGHES, Justice.

Appellant, Betty Lee Floyd,[1] is the two-year old daughter of Mr. and Mrs. Wayne Floyd. On September 30, 1959, she and her mother, and perhaps her father, were sitting in the family car parked on the Travis County dump ground where Mr. Floyd was "burning out some salvage wire and motors." While Betty Lee and her mother, and possibly the father, were in their car, a City of Austin garbage truck, driven by appellee, Henry Homer Organ, Jr., collided with the Floyd car injuring Betty Lee, her father and mother.

The case was tried to a jury which convicted appellee of negligence, found that the reasonable amount of the necessary medical expenses incurred before the trial as a direct and proximate result of the injuries sustained by Betty Lee on the occasion in suit to be $146.75, but found that she sustained no monetary damages from such injuries.

The single point of error presented is that the finding of the jury denying Betty Lee damages for her injuries is against the great weight and preponderance of the evidence. We sustain this point.

Perry Hurd, a witness for appellant, testified that he was present when the garbage truck collided with the Floyd car, and concerning Betty Lee testified:

"Q. Where was the little girl?

"A. She was in the car, kind of tied up in the dash, or wheel, or something.

"Q. Did she appear to be injured?

"A. She was.

"Q. Will you describe her condition for us?

"A. Well, roughly, her teeth looked like her gums were bleeding pretty bad. There was so much blood I couldn't tell exactly.

"Q. Was she crying or unconscious?

"A. She was kind of out at that time."

This witness conveyed Mr. Floyd and his daughter to the hospital, and regarding the condition of the child enroute testified:

"Q. What was her condition on the way to the hospital there?

"A. Well, at first she was kind of out, I would say, and she was bleeding pretty bad, and I disremember whether he taken his shirt or his other shirt and tried to stop some of the blood, and before we got into town, of course, she came to.

1. She prosecuted this suit through a guardian ad litem.

"Q. Did she have any difficulty there in the truck?

"A. Well, she was kind of struggling from so much blood."

On cross examination, Mr. Hurd testified:

"Q. Where was the blood coming from on this little girl?

"A. Well, it looked like to me it was coming out of her gums under her lip somewhere.

"Q. It was from a cut on the mouth?

"A. It was from a cut somewhere."

Appellant's father gave the following testimony regarding her injuries:

"Q. How was your little girl hurt?

"A. Well, sir, she had an injury on her forehead and a smaller injury to her mouth.

"Q. Was she conscious or unconscious?

"A. Well, she was unconscious when I remember holding her.

\*     \*     \*     \*     \*     \*

"Q. How did the little girl \* \* \* how did it affect her?

"A. Well, naturally, she had a cut on her head, and she had soreness and complained of headaches, as a child would, \* \* \* I mean I ain't saying it is me or someone else; I mean just as a child, you know, crying with it.

"Q. Did it affect her any as to her emotional state, or anything of that kind?

"A. Yes, sir.

"Q. How was that?

"A. Well, sir, when she seen a City garbage truck, she went into hysterics.

"Q. How long did that last?

"A. Over a period of months.

\*     \*     \*     \*     \*     \*

"Q. All right. Does she have a scar from the cut?

"A. Yes, sir.

"Q. Where is it?

"A. On her forehead right there under the hairline.

"Q. Could you describe it just briefly?

"A. Well, sir, it is just a scar an inch or so long on the forehead, and the stitch marks still show on it.

"Q. You mean the cross-marks?

"A. Yes, sir."

On cross examination Mr. Floyd having testified that Betty Lee was, at the time of trial, four years old, two years having elapsed since her injuries, testified:

"Q. And that scar has just about disappeared, hasn't it?

"A. No, sir.

"Q. Well, it is not a disfiguring scar, is it?

"A. Well I couldn't state what disfiguring meant."

Dr. John Garcia, who gave Betty Lee emergency treatment at Brackenridge Hospital shortly after she sustained injury, testified:

"A. We saw Betty Floyd in the emergency room at Brackenridge Hospital.

"Q. All right. What was her condition at the time you saw her?

"A. Well, we had been called down to see her because she had been in an automobile accident. When we saw her, she was bleeding profusely from a laceration over her left eye-

brow, a little bit higher than the eyebrow.

"Q. All right. What examination did you perform at that time and what were your findings?

"A. Our examination was complete. The only pertinent findings we found, other than the laceration, were evidence of sluggish reaction of her pupils to light, from which we concluded she might have a very mild cerebral concussion.

"Q. What is a cerebral concussion, Doctor.

"A. It is essentially a shaking up of the brain inside the skull.

"Q. All right. What treatment, if any, did you give her?

"A. Supportive only, and we sutured up her laceration.

"Q. By sutured, you mean * * *

"A. Closed it up surgically. We cleaned it up and pulled it together.

"Q. What we call stitches?

"A. Yes, sir.

"Q. All right. Other than the treatment there in the emergency room and possibly removing the sutures, did you give her any other treatment or see her on any other occasion?

"A. No, sir.

"Q. As far as you know, has she recovered from the injuries?

"A. As far as we know, she did well.

"Q. How about the laceration that she received, Doctor, * * * was that the type of laceration in your opinion that would probably leave a scar?

"A. It very likely would. It was the type that where breaking the skin is not real clean. It is due to pushing the skin against a hard object, and it frequently leaves a little more scar than if it was cut with a piece of glass or cut with a knife or something like that.

"Q. In your opinion, would you have expected such a laceration to leave a scar?

"A. I would think it would leave some scar.

"Q. Do you recall about where it was on her, * * * whether it was at her hairline or below the hairline?

"A. I have listed it * * * I have not seen her in a long time, but we had it listed as above the left eyebrow, so it could be anywheres below the hairline, between the hairline and the eyebrow.

"Q. All right, sir; some portion of the forehead then.

"A. Yes, sir."

On cross examination, Dr. Garcia testified:

"Q. Doctor, it is a fact, is it not, that a two-year old child will tend to outgrow a scar so that it would not be noticeable?

"A. On the whole, they should. It depends, of course, on the care that was given the child.

*    *    *    *    *    *

"Q. Doctor, how long do you suppose the child was in the emergency room?

*    *    *    *    *    *

"A. I would imagine about thirty-five or forty minutes; under an hour, yes, sir.

"Q. I see. How many stitches were taken, or sutures?

"A. We took six stitches."

On redirect examination, Dr. Garcia testified that from the type of laceration sustained by Betty Lee to her forehead that he would expect it under ordinary circum-

stances to leave more scar than a clean wound.

Dr. Garcia also testified that the charge for his services, $125.00, included subsequent treatment of the child for her injuries. No subsequent treatment was requested or given.

Mr. J. C. Bailey, a witness for appellee, and one of the helpers on the garbage truck driven by appellee, testified that following the collision he walked over to the Floyd car. We quote from Mr. Bailey's testimony:

"A. Well, after the truck stopped, I got out and walked over to the car and asked if any of them was hurt.

"Q. And what did they say?

"A. They said no, wasn't nobody hurt.

"Q. Do you remember which one of them said that?

"A. The fellow driving.

"Q. Did he look like he was hurt?

"A. No, sir.

"Q. Did he look like he was dazed and didn't know what he was saying?

"A. No, he was laughing about it. He was laughing, he didn't think anybody was hurt, and later he looked down at the kid and blood was running down her forehead, and started hollering.

"Q. Who started hollering?

"A. The baby.

"Q. I see. When he said that nobody was hurt, was that before or after he saw the child was bleeding?

"A. That was before."

Testifying further, and in speaking of Mr. Floyd, the witness continued:

"Q. Then how did he get the child out?

"A. He reached over * * * after he opened the door, his wife, or the lady in the car, said, 'Do something for her.' So he reached back in the car and got the baby and started running down the road with it.

"Q. And how far did he run down the road?

"A. Oh, about, I would say, fifteen or twenty yards.

"Q. And why did he stop?

"A. Another fellow was standing up there and hollered and told him he would take him to the doctor, standing to the side there, driving a truck.

"Q. Do you know a colored man by the name of Perry Hurd?

"A. Well, I have seen him.

"Q. Was it a colored man that he took the child to?

"A. Yes, it was."

Appellee, called as an adverse witness, testified:

"Q. Did you see the little girl?

"A. I seen the little girl when they put her in the truck?

"Q. Was she hurt?

"A. I seen a little bloody spot on her. I don't know how had.

"Q. Just a little bloody spot, but you don't know how bad?

"A. Well, I wouldn't say. I didn't get that close."

Called as a witness in his own behalf, appellee testified:

"Q. Could you tell whether or not anybody in the Mercury was hurt?

"A. I remember when I saw the little girl, she had a little bloody spot on her; that is all."

We have set forth all of the evidence of substance relating to the injuries sustained by Betty Lee.

To us, the evidence is overwhelming that Betty Lee sustained physical pain and some disfigurement. If, as is unquestioned, these elements have monetary value, then some such value should be awarded to Betty Lee.

Mental anguish, also an element of damage submitted to the jury, is more difficult of ascertainment in a two-year old child. Betty Lee's aversion to garbage trucks is an indication of mental suffering.[2] Also, it would seem to us, as laymen, that a child of Betty Lee's age who does not expect or understand the infliction of pain upon her would sustain more mental shock from injury than an adult who is aware of the facts of life.

The judgment of the Trial Court is reversed and this cause is remanded for trial.